UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROBERT AGOSTISI,

                 Plaintiff,                          **COMPLAINT**

        -against-                      Jury Trial Demanded

JOHN BENDO, SCOTT MANDEL, JOHN MCNALLY,
MICHAEL DELURY, KAREN MCINNIS, and
ELIZABETH TRESTON (in their official and individual
capacities), and the CITY OF LONG BEACH,

                 Defendants.
-------------------------------------------------------------------X

Plaintiff, Robert Agostisi, by and through his attorneys, LEEDS BROWN LAW, P.C., complaining of Defendants herein, alleges upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1.      This is a civil action for compensatory and punitive damages, proximately resulting from Defendants' violations of Plaintiff's rights as guaranteed to him by the First and Fourteenth Amendments to the Constitution of the United States and is brought pursuant to 42 U.S.C. § 1983, and any other cause of action which can be inferred from the facts set forth herein, including, but not limited to, common law claims for breach of contract and defamation.

2.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1343(a)(3), 28 U.S.C. § 1343(a)(4).

3.      Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

4.　　Plaintiff, Robert Agostisi ("Agostisi") was formerly employed by Defendant, City of Long Beach ("City").  Agostisi served as the City's Assistant Corporation Counsel ("ACC") from November 2006 to September 2014.  From September 2014 to February 2019, Agostisi served as the City's Corporation Counsel.  From February 2019 to September 2019, Agostisi served as the Acting City Manager/Corporation Counsel.  Agostisi was and still is a resident of Suffolk County, State of New York.

5.　　Defendant City is a municipal corporation duly constituted pursuant to the laws of the State of New York and is located in Nassau County.

6.　　Defendant, John Bendo ("Bendo"), has been a member of the City Council ("Council") since January 2018, and has been the Council's President since January 2020.  Bendo was and still is a resident of Nassau County, State of New York.

7.　　Defendant, Scott Mandel ("Mandel"), has been a member of the Council since 2011.  Mandel was and still is a resident of Nassau County, State of New York.

8.　　Defendant, John McNally ("McNally"), formerly served as Bendo's campaign manager, and has been employed by the City since March 2020. McNally was initially hired as the Executive Assistant to the Long Beach City Manager.  Upon information and belief, McNally's job title was changed to Director of Public Relations in 2021.  McNally was and still is a resident of Nassau County, State of New York.

9.　　Defendant, Michael Delury ("Delury"), has been a member of the Council since January 2020.  Delury was and still is a resident of Nassau County, State of New York.

10.　　Defendant, Karen McInnis ("McInnis"), has been a member of the Council since January 2020.  McInnis was and still is a resident of Nassau County, State of New York.

2

11.     Defendant, Elizabeth Treston ("Treston"), has been a member of the Council since January 2020.  Treston was and still is a resident of Nassau County, State of New York.

## FACTUAL BACKGROUND

12.     On December 4, 2006, Agostisi commenced employment with the City as an ACC.

13.     Agostisi was hired to represent the City in all employment and civil rights cases, as well as federal cases.  His duties expanded to include all Public Employment Relations Board ("PERB") proceedings, disciplinary proceedings, grievance arbitrations, and compliance matters with state and federal regulators and internal labor relations.  Agostisi also served as counsel to the Long Beach Civil Service Commission.

14.     As ACC, Agostisi reported to Corporation Counsel, Corey Klein, and the City Manager.

### *The City Manager Position*

15.     The City Manager is appointed by the Council and serves as the City's chief executive officer.

16.     The City's Charter ("Charter") vests all administrative functions in the City Manager.

17.     Accordingly, the City Manager has sole and exclusive power to hire, supervise, and discharge all officers and employees, and sign contracts on the City's behalf.

18.     From January 2012 through December 2017, the City Manager was Jack Schnirman ("Schnirman"), who was/is affiliated with the Democratic party and currently serves as the Nassau County Comptroller.

19.     From January 2018 through January 2019, Police Commissioner Michael Tangney ("Tangney") served in the dual role as Acting City Manager and Commissioner of Police.  Tangney

3

was affiliated with the Democratic Party and, during his tenure as Acting City Manager, his wife, Darlene Tangney served as the chair of the Independent Democratic Club of Long Beach.

### Political Landscape in the City

20.     As registered Democrats outnumber Republicans by a large margin within the City, political associations often consist of rival factions within the Long Beach Democratic Party ("LBDC").  The Nassau County Democratic Party ("NCDC") sometimes aligns itself with one or more of these factions.

21.     Additionally, appointed officials (a/k/a "exempt employees" or "exempts") sometimes make up their own political factions.

22.     The term "exempt" derives from a classification under NY Civil Service Law wherein employees are not required to take competitive examinations, or be appointed from eligible lists, prior to hiring.  This band of job titles, along with another category referred to as "unclassified," consist of the City's highest-ranking administrative officials.  Notwithstanding this distinction, exempt and unclassified positions are customarily referred to collectively as "exempts."

23.     Pursuant to the Charter, the Council selects the City Manager, and the City Manager selects the exempt employees.  The exempts consist of a mix of employees hired by the current or past political administrations.

24.     Throughout Agostisi's tenure, during Council meetings, the Council President sat at the center of the semi-circular dais, flanked by the City Manager and Corporation Counsel. Other Councilmembers sat to the sides of the three in the center.

25.     This configuration reflected the prominence and heavy participation of the City Manager and Corporation Counsel at meetings.   This often made the City Manager and

4

Corporation Counsel the faces and voices of the political administration and exempts, terms that were often used interchangeably.

26.     Regardless of the political party in power, Agostisi performed his duties in an exemplary manner resulting in multiple promotions and many favorable outcomes for the City.

***Separation Pay for Accrued Sick Leave and Vacation Time***

27.     In 1997, the Council amended the City's Code of Ordinances ("Code") "to establish uniform provisions for vacations and sick leaves and termination benefits to full-time employees not covered by collective bargaining agreements ("exempt employees")."  (City Code § 19-18, *et seq*.).

28.     The Code amendments provided:

B.  "*Sick leave entitlement*….[u]pon termination of employment, exempt employees **shall be entitled** to payment in cash for the same number of accumulated sick days at the rate of thirty (30) percent of the total number of days accrued, multiplied by the rate of pay at the time of termination.

*          *          *

I. *Vacations*.  Exempt employees shall be entitled to the same vacations available to civil service employees pursuant to the collective bargaining agreement then in effect. However, **no exempt employee shall accrue or carry into the succeeding year <u>more than fifty vacation days</u>** unless for good cause shown, the city council shall authorize such increased accrual.  Permission to exceed fifty (50) days shall be required for each year the exempt employee seeks to accrue more than fifty (50) vacation days.  **<u>In no event will an employee be entitled to cash equivalent of more than fifty (50) vacation days</u>** at the time of his/her termination, resignation, or other leaving from City employment."

City Code §§ 19-19(B), (I) (emphasis added).

29.     The word "entitled" means "having a right to certain benefits or privileges." (https://www.merriam-webster.com/dictionary/entitled).

30.     Thus, while the statutory text explicitly provides a maximum, or "cap," for vacation accruals, no such cap exists for sick leave accruals.

31.     This implicates the "*expressio unius est exclusio alterius*" canon of statutory construction which is codified by statute.  (McKinney's Cons. Laws of N.Y., Book 1, Statutes § 240).

32.     This presumption gives rise to an "irrefutable inference" that differences in statutory text are deliberate.  *Rivers v. Birnbaum*, 102 A.D.3d 26, 36 (2d Dept. 2012) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983).

33.     Consistent with the Code and as adopted by Council resolution, the Civil Service Employees Association ("CSEA") collective bargaining agreement (1998-2003) ("CBA") also contained a cap of fifty vacation (50) days, subject to certain exceptions.

34.     In 2000, Hon. Joel Asarch ("Asarch") served as the City's Corporation Counsel. Asarch (now deceased) resigned from City service in or about 2002, after he was elected as a Justice of the Supreme Court of the State of New York, County of Nassau.

35.     By memorandum dated October 12, 2000 to the then-City Comptroller, Asarch rendered a legal opinion that CSEA employees were eligible to receive separation pay up to 75 days.

36.     In 2003, the Council adopted a successor CBA extending to 2009.  The provisions regarding sick and vacation leave remained the same or substantially similar.

37.     The City's payroll system, through approximately 2004, allowed employees to accrue 50 vacation days, but also tracked surplus days (a/k/a "carryover days") of up to 25 days, for a total of 75 days.

38.     Accordingly, pursuant to Asarch's legal interpretation and the payroll system, a practice existed prior to Agostisi's employment with the City whereby all employees were permitted to accrue up to 75 vacation days.

39.     From 2000 through 2011, **<u>every</u>** exempt or union employee (approximately 67) who accrued more than 50 days upon separation was paid for the overage, up to 75 days.

40.     This practice fostered the reasonable expectation that employees would be paid for accruals up to 75 days upon separation.

41.     In or about 2004, the City changed payroll systems that displayed total vacation leave accruals per employee.  This did not alter the 75 day accrual practice.

42.     Subsequently, § 8-1.7 of the successor CSEA contract (2009-2015) was updated to reflect the practice of allowing employees to accrue, and receive, separation pay for up to 75 vacation days.  The Code was never updated to reflect this practice, which had been applied to all employees, including exempts.

43.     On February 21, 2012, the Council, by standard Council resolution, resolved to "afford all full time CSEA and exempt employees the opportunity to participate in an Early Retirement/Separation Incentive Program, at a rate of fifty (50%) of his/her unused sick time…."

44.      When the Council passed this resolution, neither Section 19-19(B) nor (I) of the Code were repealed, and the statutory text remains intact today.

45.     Thus, the Council could not have passed a resolution permitting a 50% payout if the Code imposed a 30% cap.

46.     As such, the Council's 2012 resolution reflected the Council's understanding of the existing and ongoing interpretation of the Code which allowed the City to provide employees compensation of over 30% for unused sick days.

47.      The Council was not involved in the calculation of individual payouts, or the formulas applied to determine separation payments.

48.     Later in 2012, the City Manager, by memorandum, acting on behalf the City, increased compensation for unused sick days to 65% for exempt and union employees.   Although this "incentive" was supposed to expire on June 29, 2012, employees who retired thereafter continued to collect 65% of their unused sick days.

49.     In 2014, the City Manager, by memorandum, acting on behalf of the City, reissued the 65% accrued sick time incentive.  Although it was supposed to expire on March 31, 2014, upon information and belief, thereafter employees continued to collect 65% of their unused sick days.

50.     In sum, long before Agostisi was hired, it was long-standing City practice to permit employees to be given separation pay to the cap of 75 days for vacation time, and to be paid over 30% of accrued sick time which was not precluded by statutory language of the Code.

### Drawdown Payments

51.     It was also a long-standing City practice to permit drawdown payments (i.e., the City would sometimes make advance payments to employees for separation pay during active employment).

52.     This practice helped the City avoid large bulk separation payments, thereby helping keep the City's budget more consistent.

53.     Between 2008 and 2011, 118 employees were permitted to "draw down" their accrued banks of time during active employment. Many of these drawdowns came from employees' vacation banks and some came from compensatory banks ("comp time"), a bank of time that union employees accrue, and which consists of deferred overtime payments.

### Agostisi's Promotion

54.     In November 2014, Corporation Counsel Klein was elected City Court Judge, with his term set to commence effective January 1, 2015.

8

55.     Klein's absence from September through December 2014 left Agostisi in charge of the Corporation Counsel's Office, where he served as Acting Corporation Counsel.

56.     In January 2015, the City promoted Agostisi to the position of Corporation Counsel.

57.     The City did not initially hire a replacement for Agostisi's ACC position.

58.     This forced Agostisi to perform multiple roles, occasionally covering court appearances, at a time of low staffing.

***Enter John Bendo***

59.     On or about July 7, 2015, during a Council meeting, Agostisi had his first encounter with Bendo.  During the public comment segment (a/k/a "good and welfare"), Bendo implied that the government betrayed the residents by supporting sales and mortgage recording tax abatements for iStar Financial ("iStar").

60.     iStar is a multi-billion dollar real estate developer which owned the largest vacant parcel in Long Beach (a/k/a the "Superblock").

61.     Developers, like iStar, which apply for real estate tax abatements at the Nassau County Industrial Development Agency ("IDA") also apply for sales and mortgage recording abatements as a matter of course.  Therefore, Agostisi helped divert those components of iStar's application to the Long Beach Local Development Corporation ("LDC"), which also has the authority to grant such relief, so that the LDC (which is fully-funded by the City) could secure the corresponding transactional fees.

62.     When Agostisi advised Bendo of these facts, Bendo ignored that this was for the benefit of the City and angrily remarked that everyone was loyal to "305 West Park Avenue," which was the address of the then LBDC.

63.     Bendo's comments revealed his perception that the LBDC was a disloyal political faction with which Agostisi was associated.

64.     This incident exemplifies Bendo's effort to use a seemingly neutral incident to score political points, and evidenced his elevation of petty political interests over legitimate City concerns.

### Discord in City Politics

65.     In 2015, the NCDC removed LBDC Chairman Michael Zapson, from his role as zone leader for the City.

66.     By January 2016, this caused the LBDC to splinter into a separate political faction known as the "Long Beach Independent Democratic Committee" ("IDC").   Throughout 2016, political tensions escalated between the IDC and the NCDC.

67.     Separately, another political faction (nameless at the time, but eventually called the New Wave Democrats and referred to as such hereinafter) began to develop.  This group consisted of, *inter alia*, Bendo, as well as members of the paid firefighter unit who were upset by layoffs and departmental restructuring in 2015 (with which Agostisi played a key role).

68.     In the 2015 election, NCDC temporarily aligned itself with the New Wave Democrats in opposition to Zapson and the IDC.

69.     The IDC's candidates won and, thus, NCDC had installed a new leadership team.

70.     In April 2016, a State Assemblyman, Todd Kaminsky (a Long Beach resident), won a special election for a district in the New York State Senate that encompassed the City. Kaminsky's influence steadily grew throughout 2016.

71.     As the City's politics became more incendiary, Schnirman and the exempts (along with certain Councilmembers) found themselves increasingly attacked by the New Wave Democrats through orchestrated, vitriolic exchanges at Council meetings.

72.     In response, the exempts initiated collective action to counter the growing political influence of the New Wave Democrats.  For instance, on May 13, 2016, all exempts (except Agostisi and Schnirman) sent a letter to the Council requesting a meeting to rebut some of the attacks and misinformation that had appeared in local media.

73.     While Agostisi and Schnirman did not sign this letter, they were perceived as doing so as both were the faces and voices of the exempts – and the political administration – due to their roles and responsibilities at Council meetings, which often meant defending the elected Councilmembers from coordinated political attacks from the New Wave Democrats.

74.     In May 2016, the exempts held a meeting, after work hours, off work premises, where they discussed methods to improve their work conditions which were being negatively affected by the New Wave Democrats.  By this time, raises for exempts had become a topic of heavy discussion in Council meetings and the media, and a public controversy.

***Reissuance of the Sick Leave Accrual Allowance and Increases Thereof***

75.     In 2016, Schnirman, by memorandum, acting on behalf of the City, reissued the policy regarding 65% sick leave accrual payouts.  Although this incentive was set to expire on October 1, 2016, upon information and belief, employees who retired thereafter still collected 65% of their unused sick days.

76.     In or about August/September 2016, Jim LaCarrubba (the City's ex-Commissioner of Public Works) told Agostisi that Schnirman had been awarding some exempts 100% of accrued sick time in separation pay.

77.     Agostisi was aware that exempts had regularly exceeded 30% since 2012, but this was the first time that he learned that some were receiving 100%.

78.     While Agostisi was surprised by this, it was not precluded by the Code which guaranteed a minimum of 30% but did not cap the amount the City could pay.

79.     Further, since the Code authorized the City Manager to increase employee compensation, there was nothing improper about these payments.

***Agostisi's Increasing Profile and Execution of First Separation Pay Agreement***

80.     From August 2016 through November 2016, Agostisi recovered or helped to recover approximately $4.9 million in revenue for the City.

81.     In November 2016, Agostisi, tried a two-week federal jury trial in *Parker v. City, et al*., EDNY No. 11-cv-5412 (ADS) (§ 1983 false arrest and battery claim).

82.     His efforts resulted in a defense verdict, the first and only such verdict in nearly a generation.  It was the only known example of a sitting Corporation Counsel trying a jury case in the City's history.

83.     Also in November 2016, Agostisi negotiated an $800,000 settlement for the City (*City v. Lexington Ins. Co.*, E.D.N.Y. No. 14-cv-06617 (LDW) (GDB)) by applying the contractual equivalent of the *expressio* principle to the City's contract with its insurer.

84.     In December, Agostisi began preparations for a trial in *Long Beach Professional Firefighters Association v. City*, Index No. 15-005301 (Nassau Co. S.Ct.) ("Firefighter trial"), which stemmed from the City's Fire Department restructuring in 2015.   Agostisi's presence was vital because of his extensive involvement in the restructuring as well as his familiarity with the relevant law.  Also, he was the only trial attorney in the Office.

85.    In early December 2016, Agostisi advised Schnirman of his intent to resign and provided ample notice to facilitate a transition.

86.    Schnirman responded by saying that Agostisi was indispensable and commenced negotiations with Agostisi to secure Agostisi's employment at least through completion of the Firefighter trial.

87.    This led to a Separation Pay Agreement ("Agreement 1").

88.    Therein, the City acknowledged Agostisi's "exceptional" job performance, as well as the tasks it needed him to perform before his departure, the most pressing of which was the Firefighter trial that the court had been marked "final" and was set for trial in January 2017.

89.    Agreement 1 provided that, "in exchange for the foregoing, in light of the identical practices utilized upon separation with respect to other Civil Service 'exempt' class employees…[,]" Agostisi would receive 100% of his accrued sick time within ten (10) days of termination.  It also set forth the payment formulas for accrued time.  With respect to vacation, it did not reference a cap.

90.    The Agreement also required the parties to "undertake best efforts…and any other steps and efforts that may become necessary by order of the court or otherwise, to effectuate [the agreement]."

*Agostisi's Performance Pursuant to Agreement 1*

91.    In January 2017, Agostisi commenced the Firefighter trial, resulting in a complex settlement agreement that resolved multiple legal and administrative matters.

92.    Before this resolution, the longstanding conflict between the parties was documented in *LBPFA v. City of Long Beach*, No. 14-007731, 2014 N.Y. Slip Op. 24272, where the court noted the parties' consensus "that the relationship between these two groups has been

marked by rivalry and conflict." *See also*, *Gusler v. City of Long Beach*, *et al*., 2016 WL 11493644, *2 (E.D.N.Y. Aug. 4, 2016), *aff'd*, 715 Fed. Appx. 68 [2d Cir. 2018]).

93.     After decades of conflict, the reduced tensions that resulted from the settlement represented a signature achievement.  Key features of the settlement agreement still govern the relationship between the parties today.

94.     Thus, the City received the benefit of its bargain memorialized in Agreement 1.

95.     In 2017, iStar was planning to make a last-ditch effort to obtain a PILOT from the IDA.   Agostisi was tasked with presenting a plan to persuade the public, and the Council, to support the PILOT without compromising the City's position in litigation.

96.     Agostisi strategized and helped develop a presentation that was given by City Comptroller Kristie Hansen-Hightower ("Hightower") and outside counsel.

97.     Shortly thereafter, and before iStar submitted its third, formal application to the IDA, Agostisi implemented a secret contingency plan that he had devised.  Subsequently, various residents successfully petitioned the Supreme Court, Nassau County, to compel a meeting of the Long Beach Zoning Board of Appeals ("ZBA") to determine whether iStar's building permit had lapsed.

98.     Throughout 2017, as Schnirman pursued elective office, Agostisi's role and responsibilities increased.  In Fall 2017, to address a growing list of problems, Agostisi organized routine meetings of top City officials, consisting of exempt employees.  These management committee meetings continued into 2018.

99.     Agostisi also spent a great deal of time preparing experts assessing the damages in *Haberman v. Zoning Board of Appeals*, Index No. 1138/04 (Nassau County), which involved the

Superblock and stemmed from events that occurred before Agostisi's tenure as Corporation Counsel.  The City was in default on this matter.

100.     The *Haberman* matter, which has been the subject of multiple appeals, including two separate decisions at the New York State Court of Appeals, was the City's single largest legal/financial liability.[1]

### The New Wave Democrats Coalesce and Take Control

101.     During 2017, NCDC supported incumbent Councilman Scott Mandel and Chumi Diamond (a political newcomer affiliated with NCDC).

102.     In response, the New Wave Democrats selected its own slate of candidates, including Runnie Myles, Barbara Bernadino, as well as Joe Miccio, a former officer in the New York City branch of the paid firefighters' union, who was affiliated with the Long Beach paid firefighters.

103.     During the campaign, the NCDC filed a lawsuit on behalf of Mandel and Diamond which challenged the other candidates' nominating petitions, prompting Myles, Bernadino and Miccio to withdraw.  This secured the primary election for Mandel and Diamond.

104.     Mandel and Diamond would ultimately prevail in the general election in 2017, along with Bendo.

105.     Kaminsky supported Bendo and persuaded NCDC to allow Bendo to run on the Democratic line, despite his not being a registered Democrat.

---

[1] In November 2020, Haberman was awarded $131 million after a bench trial, which was subsequently reduced to approximately $110 million.  On December 22, 2021, the City announced it had reached a settlement-in-principle for $75 million, *plus* the right to build two 13.5 story towers on his property.

106.    Bendo's campaign chair was McNally, who was then employed by the Suffolk County Industrial Development Agency.

107.    Sam Pinto, at all relevant times, was a member of the paid unit of the Long Beach Fire Department.  In 2017, he was a union officer, and later became the union president.   Pinto and Kaminsky are political allies and close friends.

108.    Bendo, McNally, Pinto, and Kaminsky became core members of the New Wave Democrats.  They separately and collectively harbored political-based animus for Agostisi.

109.    Delury, McInnis, and Treston became affiliated and actively involved with the New Wave Democrats and were members when the below-described conduct occurred.

110.    To quell the political unrest created by the emergence of the New Wave Democrats, in June 2017, NCDC divided the committee seats of the LBDC amongst the factions, with  NCDC retaining several seats on the committee.

111.    Tensions continued to mount even after this arrangement.

***The Execution of Agostisi's Second Separation Pay Agreement***

112.    By October 1, 2017, Agostisi planned to secure alternate employment.

113.    In or about October 2017, Acting Comptroller Shari James ("James") told Agostisi that the City was preparing to issue separation pay to employees who planned leave City service by the end of the year.

114.    Thereafter, Agostisi approached Schnirman to request modifications to Agreement 1, with respect to the timing of the payment.

115.    This culminated in a Supplemental Agreement wherein the City and Agostisi agreed to modify Agreement 1 providing that 80% of Agostisi's separation pay would be paid by November 16, 2017, which is the time that most other exempts were issued payment.

116.    After Election Day in November 2017, Schnirman offered Agostisi a position in the Nassau County Comptroller's Office.    Additionally, Town of Hempstead ("Town") Supervisor-elect Laura Gillen also discussed hiring Agostisi.

117.    Agostisi held his separation check while he weighed his options.

118.    Towards the end of December 2017, Acting City Manager/Police Commissioner Tangney asked Agostisi to remain with the City, as did Council President Anthony Eramo ("Eramo") and Vice President Diamond.

119.    These officials expressed concern about losing Agostisi while also losing the Chief Executive Officer (Schnirman), and the second Comptroller in six months (Hightower, who resigned in July 2017, and James, who resigned in December 2017).

120.    The City offered Agostisi a $25,000 raise to stay with the City.  The raise was scheduled to take effect January 1, 2018.

121.    Agostisi's decided to remain with the City.

122.    On December 29, 2017, Agostisi approached Payroll Supervisor Thomas Larson ("Larson") to return his separation check.

123.    Larson told Agostisi that he could not return the check because the wages had already been reported for tax purposes.

124.    This conversation was memorialized in an email exchange between Larson and Agostisi.

125.    Shortly thereafter, Hightower, then serving as a paid consultant in the Comptroller's Office, confirmed Larson's position.

126.    On or about December 30, 2017, the check was deposited into Agostisi's bank account.

127.    Tangney assigned Agostisi to hire a new Comptroller as a result of James' resignation which led the City to elevate Erin D'Antonio, an administrative employee in the Comptroller's Office, to the Acting Comptroller position.

128.    Simultaneously, among other things, Agostisi was handling critical Corporation Counsel functions, such as the retention of experts for *Haberman*, work on a sewer consolidation project with Nassau County, and an intermunicipal agreement with the Town that would allow the City to acquire land needed to complete a seawall/bulkhead around the City's utilities and processing facilities.

129.    At or around that time, Agostisi preparing a comprehensive chronology which was needed to prevent iStar from successfully advancing a $100 million claim against the City for breach of contract.

130.    Had Agostisi left the City's employ before completing this task, it could have jeopardized the City in the action that would later come to be known as *iStar FM Loans v. City, et al.*, Index No. 606535/18 (Nassau Supreme).  Staying to create this chronology was designed to and did help insulate the City from a collateral attack.

### *Bendo Joins the Council and the Political Hostility Intensifies*

131.    On January 1, 2018, Bendo was sworn in and took a seat on the Council.

132.    At or about the same time, Tangney assumed the role of Acting City Manager.

133.    Agostisi had dinner with Bendo on January 25, 2018, where Bendo revealed that members of the New Wave Democrats disliked Agostisi.  Bendo indicated that Agostisi's main obstacle was "guilt by association" with Schnirman.  This was a reference to Agostisi's perceived political alliance with Schnirman, who was the leader of the exempts and the political administration.

### *Kaminsky Attempts to Exert Political Influence*

134.    In or about February or March 2018, Agostisi received a cell phone call from the assistant to the NCDC Chairman.   During this call, Agostisi was asked to contact Kaminsky to schedule a meeting.  This was the first and only time that the NCDC Chairman's Office directly contacted Agostisi.

135.    On March 5, 2018, at the request of the NCDC Chair, Agostisi met with Kaminsky. Kaminsky said that he wanted Agostisi to keep him informed of all major City happenings, and indicated that he had been excluded by Tangney.  The tone and substance of the conversation indicated that Kaminsky wished Agostisi to politically associate with Kaminsky by helping him to advance his political goals and use City events to do so.

136.    Agostisi did not want to be so associated and responded by saying that he would provide Kaminsky with whatever non-privileged information he was able to share.

137.    In late March 2018, Kaminsky called and expressed anger at Agostisi for failing to advise Kaminsky of a small, City-sponsored event in the Recreation Department.

138.    On March 29, 2018, Agostisi emailed Kaminsky's assistant, Halie Meyers, a City event schedule.  Beyond an acknowledgement of receipt from Meyers, Agostisi never heard back from Kaminsky, and was not contacted again by Kaminsky until June 2019.

### *Political Attacks Increase and Include the Use of Separation Pay*

139.    Throughout March 2018, Tangney gave the Council increasingly dire warnings about the City's finances.

140.    Pursuant to Hightower's recommendation, Agostisi, with Tangney's permission, added an item to the April 2018 Council agenda regarding bonding for separation pay, which was

a common practice for the City.  Hightower explained that this revenue was needed to pay bills from April through the end of the fiscal year (June 30).

141.   The separation pay item, if adopted, would have authorized publication of a notice of a public hearing.   Typically, most/all Councilmembers vote in favor of publishing the notice whenever a public hearing is required because the underlying merits can be debated at the hearing.

142.   At the April 3, 2018 Council meeting, Bendo and Moore voted, unconventionally, against publishing the notice of hearing.  Nevertheless, the item carried, and the public hearing was scheduled for April 17, 2018.

143.   Under the New York Local Finance Law, bonds must be authorized by a two-thirds super-majority of the "finance board," or the legislature.   Therefore, the two "no" votes exacerbated an already-tense situation.   At or about this time, Tangney mostly stopped speaking and meeting with Bendo.

144.   On April 5, 2018, Moore asked Agostisi to obtain a list of employees who had received separation payments over the preceding year (which necessitated the bonding).  Later that day, Agostisi asked D'Antonio to prepare the list, which she did on April 6, 2018.

145.   After seeing the list, Agostisi advised D'Antonio that the list could not be accurate, as Agostisi's separation payment was not listed.

146.   D'Antonio responded that she had generated the wrong report, and would continue to work on it with Hightower.

147.   On April 7, 2018, Hightower produced the next version of the report which was still inaccurate.  Agostisi spent the remainder of the week trying to uncover the discrepancy.

148.   On April 16, 2018, Agostisi emailed Hightower:

We need some quick help with something.   While Tangney was reviewing, he noticed that his own payout was missing.   His payout was (according to Tommy) is $51,992.67.    I could probably plug that into your spreadsheet to determine if $2.1M is enough, but I'd rather have your assessment, since this appears to be coming in right under the wire.

149.   Tangney was added to the email chain, and then Agostisi wrote to the Council:

In advance of tomorrow night's meeting, attached please find a spreadsheet prepared by Kristie, which itemizes what we refer to (collectively) as "separation payouts." "Separation pay" also includes the value of retirement incentives paid out to CSEA employees.   In addition, it includes draw-downs of accrued banks of time paid to current employees, which is a practice that dates back to the time when the City had to float a $700,000+ bond just to pay one employee's separation pay.   Since then, these staggered payouts have sometimes been used as a cost-saving measure….when employees get paid out at the conclusion of their employment, it's at their final rate of pay.   Therefore, it oftentimes saves the City money (in the long term) when payouts are staggered throughout employment.   Ex:  when an employee earns 1,000 hours of accrued time at $10/hour, it oftentimes makes sense to pay that employee out BEFORE he/she gets a raise to $20/hour (which immediately doubles the size of the payout).

At any rate, sorry for the delay, but there were a number of glitches that we caught as this process progressed.   For instance, I noticed that I was omitted from the initial list.   I explained my appearance on this list to the Council back in December, and I'm happy to re-answer any questions now, or at any time (if that's the case, thanks for providing the professional courtesy in advance of the meeting).   Also, [Tangney] later noticed that he was omitted from the list.   He has now been included as well.   While the underlying data does not come from my office, as far as I can tell, this now appears to be the full and accurate list.   I didn't want to circulate it before I was comfortable saying that.

Please let me know if you have any other questions.

150.   On April 17, 2018, a public hearing regarding separation pay occurred.

151.   During the meeting, Bendo highlighted Schnirman's separation payment and claimed that he was overpaid.  This concerned Agostisi, in part, because of Bendo's prior statement that Agostisi had "guilt by association" with Schnirman.

21

152.    At one point during the meeting, Mandel pleaded for the City to borrow as it had budgeted so it could pay its bills, and then potentially conduct an audit to evaluate overpayments, if any.

153.    The item failed, with Bendo and Moore voting against it.

154.    On April 18, 2018, Agostisi wrote a message to the Council that underscored the severity of the situation, and provided (in relevant part):

> ***The upshot is as follows:   if you want to give this item a second try, it's imperative that you do so within the next week.   Even that timeframe is pushing it, in light of the 4-6 week estoppel period before the bonds can be issued.   In other words, there are no guarantees that a second try will avert the fiscal/legal catastrophe that we're now confronting (and make no mistake, we are now staring into the abyss).   That notwithstanding, if you wait more than a week to call a special meeting (to authorize publication), it's virtually assured that we will not receive the bond proceeds by the end of May, which is when Kristie says that our cash will be fully depleted.
>
> Good luck to us all.

155.    Subsequently, Hightower realized that there were several previous separation pay bonds where the Council had authorized the borrowing of amounts greater than that actually borrowed.  These previously-authorized amounts provided the channel needed to avert a financial meltdown.

156.    After receiving guidance from bond counsel, the City implemented Hightower's idea and sidestepped a financial crisis.

157.    Bendo's vote and behavior vis-à-vis the 2018 separation pay bond was not motivated by principle.[2]  Rather, it was designed to harm his perceived political adversaries like Agostisi, and the exempts generally.

---

[2] In 2020 and 2021, Bendo voted for the City to borrow funds to meet separation pay obligations.

22

158.    In April 2018, Agostisi had a private conversation with all Councilmembers (Bendo, Diamond, Eramo, Mandel and Moore) wherein Agostisi described the circumstances surrounding his separation payment, including his attempt to return it.

159.    After Agostisi explained the situation, Bendo told Agostisi that he was better off keeping his separation pay.

160.    On or about April 17, 2018, Bendo escalated his political attacks on the administration, and his political adversaries, by voting against the "blanket transfer" item on the Council agenda.  Variations of this *pro forma* device are routinely used by government agencies to balance books prior to end of the fiscal year.

161.    This item allows the Comptroller to transfer funds from (dozens or even hundreds) of lines with surpluses, to those with deficits, to ensure that bills are paid.  Failure to adopt the blanket transfer presents enormous financial and legal risks, unless the legislative body undertakes the work itself.

162.    Bendo's vote was motivated by a desire to attack his perceived political adversaries, which he elevated over the City's solvency.[3]

163.    Beginning in April 2018, Bendo and other New Wave Democrats engaged in increasingly hostile attacks against other Councilmembers, Tangney, Agostisi, and the exempts.

164.    A frequent subject of such attacks was Agostisi's raise.

165.    These attacks grew so vitriolic, Agostisi voluntarily relinquished the raise, effective July 1, 2018.

### Law Enforcement Investigations of Separation Pay, Exempts' Collective Action

---

[3] In 2020 and 2021, Bendo voted in favor of the blanket transfer items.

23

166.    On April 24, 2018, the Nassau County District Attorney's office ("DA") met with Agostisi, ACC Gregory Kalnitsky, and Payroll Supervisor Thomas Larson to discuss separation payouts.

167.    On April 27, 2018, the DA met with Agostisi and Kalnitsky, who brought with them Building Commissioner/Fire Commissioner Scott Kemins.  Kemins helped explain the Asarch Memorandum, inasmuch as Kemins was one of only two remaining exempt employees who was employed by the City when the memorandum was issued.

168.    Meanwhile, the New Wave Democrats' political attacks against exempts escalated throughout May 2018 and included attacks on exempts' compensation.  However, exempts made up approximately 1% of the City's workforce and budget.

169.    The hyper-focus on such a small portion of the budget evidenced, among other things, that these attacks were politically motivated.

170.    Consequently, in May 2018, the exempts negotiated collectively regarding raises. The local media published multiple stories about the exempts' raises.

171.    In June 2018, Tangney received a subpoena from the federal government regarding separation pay.  As Agostisi had received separation pay, Agostisi recused himself from the matter.

172.    The City retained former Assistant U.S. Attorney Anthony Capozzolo of Lewis Baach Kaufmann Middlemiss PLLC to represent the City in connection with the matter.

173.    Kalnitsky was the City's liaison to assist Capozzolo.

174.    Shortly thereafter, the DA issued subpoena(s) to the City.  Capozzolo and Kalnitsky represented the City is all phases of the DA investigation.

***Agostisi witnesses Kaminsky Attempt to Interfere with a State Review***

175.    In June 2018, the City applied to the NYS Financial Restructuring Board ("FRB") for a financial review.  Applicants who ultimately enact the FRB's suggested reforms are eligible for up to $5 million in grants and/or loans.

176.    On May 15, 2018 (Resolution No. 50/18), the Council authorized submission of an application to the FRB for review.  The adopted resolution provided, in relevant part:

> "WHEREAS, Senator Kaminsky has advised the City of the existence of the FRB, and its mission to help municipalities evaluate and rearrange their financial/operational practices, along with the potential financial assistance and incentives made available to participating municipalities; and
>
> WHEREAS, Senator Kaminsky has advocated aggressively on behalf of the City, and functioned as a liaison between governmental agencies…"

177.    Kaminsky's office approved this language by email to Agostisi dated May 10, 2018.

178.    The FRB then held an initial meeting to formally accept the City's application.  Therein, the FRB's executive director expressed admiration for the City's Fire Department restructuring in 2015, and indicated that the model should be replicated throughout the state.

179.    After the meeting, on July 20, 2018, Mike Pawlows of the FRB sent Agostisi an email stating: "One last item, more as a heads-up: we spoke with [Long Beach Paid Firefighters Association (LBPFA) President] Sam Pinto from the fire union.  He reached out to Sen. Kaminsky's office and asked to speak with us about the union's angle.   We had an interesting discussion and can talk about this further when we get to the workforce portion of the report."

180.    In an email reply, Agostisi asked Pawlows to elaborate.  In a follow-up call, Pawlows initially indicated that it was not uncommon for the FRB to speak to unions during reviews.   This prompted Agostisi to ask whether Kaminsky disclosed his personal relationship

25

with Pinto and his family.   Pawlows was surprised by this information, and indicated that he was unaware.

### The City's efforts to Promote Agostisi are Thwarted

181.    At or around this time, a majority of the Council and Tangney asked Agostisi to become the City Manager.

182.    Initially, Agostisi was to be appointed Acting City Manager at a special meeting of the Council on July 13, 2018.  However, the Council postponed the appointment until the next regularly scheduled Council meeting, on July 17, 2018.

183.    Kaminsky and Bendo vehemently lobbied against Agostisi's appointment.  Among other things, Kaminsky called Councilwoman Diamond to warn her that he would personally attend the Council meeting to oppose the appointment.

184.    Kaminsky's and Bendo's pretextual rationale for opposing Agostisi's appointment was the separation pay he had received.  The real reason for their opposition, however, stemmed from their perception of Agostisi's political affiliation with Schnirman and his lack of affiliation with the New Wave Democrats.

185.    In light of Kaminsky's rapidly growing political influence, the Council opted to forego Agostisi's appointment.

186.    Kaminsky later posted a related Newsday article regarding this topic, dated July 12, 2018, on his New York State Senate website.

### The Separation Pay Controversy Continues and Agostisi Becomes City Manager

187.    By May 2018, the New Wave Democrats had made exempt separation payments a major public controversy, despite the fact that they were not a problem and even if they were, it was minuscule in comparison to the numerous other issues.

26

188.    In response, the exempts' collective political activities escalated.  For instance, on July 23, 2018, the exempts sent a FOIL request for time, attendance, and other records from Nassau County Legislator Denise Ford -- a key political ally of the New Wave Democrats -- who had publicly called for investigations of *only* exempts' (but not union members') separation payouts. This political controversy was documented in a Newsday article dated July 24, 2018.

189.    By email dated November 5, 2018, Bendo requested Agostisi's Separation Pay Agreements. Agostisi responded:

> Next, I just want to clarify that this communication is being sent in my capacity as an employee, not as the City's attorney, as the subject of your request involves my own employee records.  [T]o the extent you are asking for official City records, I cannot get involved, given the subject matter.  To the extent you're asking for my personal (employee-copies) of any records, then I'm happy to meet with you, and show you anything you'd like to see. For reasons which will become obvious during our meeting, I also need to involve the City Manager in that discussion.

190.    Agostisi sought Tangney's involvement because the City Manager had sole and exclusive authority over City employees, and Agostisi had a one-sided confidentiality clause in Agostisi's Agreement, which precluded Agostisi's disclosure of same (while permitting the City to disclose it).

191.    On November 6, Bendo issued two separate responses to Agostisi's email.  In the first response, sent at 1:22 p.m., Bendo agreed to meet with Agostisi and Tangney.

192.    In the second email, sent at 2:53 p.m., Bendo said:

> Any agreements and supplements between you and the City are official documents of the City.  As a member of the City Council, I want to be provided with full copies of both the referenced agreement and any supplements to the document.  If you want to sit down and discuss the documents, I am willing to do so, but only after I receive the documents and have the opportunity to review them.

193.    On November 7, 2018, at 6:20 p.m., Agostisi responded (in part):

I was surprised by the two emails you sent yesterday.  The tenor of those emails (sent just hours apart) almost makes me think that they were written by two different people.  Be that as it may, I'm still unable to respond to the vast majority of your second email, which relates to official City actions/omissions, etc.  This silence should not, however, be construed as an admission that any of your characterizations, conclusions, or the underlying information on which they are based, are accurate.   As set forth in my previous email, the substance of your request simply precludes a response to most of your questions, statements, characterizations and/or conclusions because they are directed at me in my role as Corporation Counsel.  As noted, however, I am neither able nor authorized to respond in my official capacity.

Notwithstanding the foregoing, I am still willing to show you anything you'd like to see from my own (employee-copies of) records, which constitute my own personal property.  As such, please understand that I am not refusing your request, nor am I attempting to place conditions on it.  To the contrary, I'm trying to accommodate it in a manner that also complies with applicable law.  If you don't understand what I mean by that, I guarantee that you will within the first 10 seconds of our meeting, should you still elect to participate.

My willingness to work with you, however, should not be construed as an admission that I have any legal obligation to share the requested information with you at this time.  Rather, I am offering it: (1) despite my knowledge that your request falls (for multiple reasons) outside the scope of your official legislative duties under the Charter; (2) without any explanation of the purpose of your request; and (3) on account of my sincere desire to move past all distractions, and work constructively with you toward the betterment of the City.

With respect to no. 3, above, please let me know if you still wish to meet with the Acting City Manager and myself to discuss the issues that I described as "existential" in my last email, which, to reiterate, will require me to put my Corporation Counsel hat back on.  For purposes of clarity, they relate to the following issues, all of which are in the public domain: (1) Haberman (the damages inquest is fast-approaching); (2) iStar; (3) the lingering financial crisis; (4) the $20M critical infrastructure project; (5) the $40-50M sewer consolidation/diversion project.   Please note that this is a non-exhaustive list of projects or matters, collectively worth hundreds of millions of dollars, that will shape the LB community for the next 50-100 years.   My goal, as mentioned, is to put all distractions aside, and work together to tackle these challenges, which will profoundly impact the lives of residents (and future residents) for generations to come.  I'm sure you share that focus.

194.     Less than two hours later, Jay Gusler (a former paid firefighter politically affiliated with the New Wave Democrats) spoke during the "good and welfare" portion of the Council meeting, saying:

> [Bendo] had a conversation with Mr. Agostisi about these documents.  Mr. Agostisi acknowledged that he has a copy of this document – a personal copy of this document….[M]r. Agostisi's response, as I understand it, is that he agreed to show Mr. Bendo the records, conditionally, but he would not provide him a copy of it.

(11/7/18 City Council meeting at 53:50).

195.     Thus, it was clear that Bendo directly or indirectly provided confidential information to Gusler.  Bendo was aware that Gusler, Bendo's close political ally, would use information for gratuitous political attacks.

196.     Bendo knew of Gusler's hatred for Agostisi as Agostisi had caused Gusler to be convicted of defrauding the City.

197.     After the meeting Bendo shook Gusler's hand.

198.     On November 10, 2018, Bendo group-texted the Council: "This has not been a good week for the council and I think we have come to a fork in the road….[t]he situation with payout agreements for the Corp council [sic] and staff refusal to turnover the   documentation…."

199.     In response, Council President Eramo texted: "[i]f you don't trust the people in our administration, you assume the worst.  If you listen to conspiracy theorists, you assume the worst.  If you believe anything a disgruntled former firefighter & convicted criminal says, you assume the worst."

200.     On December 13, 2018, in a huge win for the City, the Supreme Court upheld the ZBA's decision in the iStar matter resulting in iStar's zoning variance being deemed revoked.

29

201.    In December 2018, Moore asked Agostisi to reconsider applying for the Acting City Manager position.  Agostisi indicated that he would consider doing so if at least four members of the Council (Moore, Diamond, Eramo and Mandel), agreed to support it and issue corresponding press releases in advance of the vote.

202.    Subsequently, Moore met with Agostisi and Bendo in January 2019.

203.    During the meeting, Bendo reiterated that Agostisi's problem was "guilt by association" with Schnirman and he gave no indication of how he would vote.  Agostisi understood this to reference to Agostisi's perceived political alliance with Schnirman, who was the leader of the exempts and, Agostisi's association with the exempts as opposed to the New Wave Democrats.

204.    On or about January 23, 2019, the exempts jointly filed a formal petition at PERB wherein they sought to be part of the Long Beach CSEA.

205.    The internal announcement of the petition (among the exempts) emphasized the underlying political nature of the filing which involved an effort to better their workplace conditions:

> "[W]e have a strong case with how the exempt employees of the City are constantly punted like a political football.  While exempt payouts are scrutinized and criticized, nobody says anything about the [hundreds] of union payouts.  We had a measly 1% raise…and we still took a shot … from [the Council] when they cut it purely for political theater.  Clearly public sector unions exist to prevent politicians from treating us like this."

206.    On January 29, 2019, the Council held a special meeting to appoint Agostisi as Acting City Manager.  Therein, Bendo attacked Agostisi, and complained about not being advised of the Council's intentions despite his previous meeting with Moore and Agostisi.

207.    During the meeting, Gusler said:

"I can tell you this.  If I'm driving down the street and I see Mr. Agostisi crossing the street, it's going to take every bit of willpower I have not to steer my vehicle with him."

208.    Bendo remained silent, failing to rebuke his ally's violent rhetoric.

209.    The Council voted to install Agostisi as Acting City Manager effective February 6, 2019.

210.    After the meeting, Bendo told Agostisi: "Good luck.  Your job is gonna suck."

211.    From January 30 through February 5, 2019, while Agostisi took paid time off, Bendo instigated a crisis by personally inserting an item on the Council agenda citing a long-neglected section of the Code.

212.    Throughout Agostisi's employment, the agenda was referred to as "the City Manager's agenda."   Customarily, the only way Councilmembers added items to the agenda was if/when a majority of the body instructed the City Manager to do so.

213.    In light of this well-established practice, which operates to prevent one Councilmember from appropriating an agenda, Agostisi added a separate item to the agenda that would have amended the Code to reflect this settled practice.

214.    Mandel asked Agostisi to have the item removed.  Agostisi explained that he had no intention of doing so, unless Bendo withdrew his plan to upend established practice.  Mandel then offered to broker a compromise, which he did within minutes.

215.    Agostisi then realized that Mandel was, or had already, changed political allegiances from Eramo and Diamond's faction, to Bendo's.

216.    From his appointment until June 26, 2019, Agostisi had an active tenure as Acting City Manager/Corporation Counsel, and continued to perform both jobs for a single salary.

217.    In February 2018, Agostisi began to learn the budget process in anticipation of submitting the proposed budget to the Council by April 10, 2019.

218.    Additionally, just two weeks into Agostisi's tenure as Acting City Manager. Agostisi was informed that Moody's Credit Service wanted an overview of the steps the City was taking to restore solvency.  Agostisi completed this task, but Moody's still issued a downgrade on February 20, 2019.

219.    Over the weekend of February 16-17, Agostisi reviewed an extensive motion *in limine* in *Haberman,* which had critical implications in the upcoming damages inquest – the City's greatest liability.

220.    In March 2019, Agostisi began to implement his strategy to retain a team of financial experts.  A critical component of this vision was to retain a financial advisor to serve in a role similar to director of finance, which the City had never before utilized.

221.    Leading up to the Council meeting on April 16, 2019, Mandel approached Agostisi about removing an item on the agenda that would have retained financial experts to assist the City with its severe financial problems.  Agostisi, however, did not remove the item.  This heightened Mandel's political animus for Agostisi.

222.    Additionally, Mandel and Bendo prepared an errata sheet together, with proposed budget amendments.  This errata sheet, which was published on the City website, listed only about $300,000 in potential savings, on a $97 million budget.

223.    Agostisi gave his comprehensive budget presentation in May 2019, where he detailed the City's financial crisis and how the City could overcome it.  The presentation was well received by the Council and the audience.

32

224.     In May 2019, just one month before the Democratic primary, at a public Council meeting, McNally accused the Council and Agostisi of violating the Open Meetings Law by meeting privately regarding the budget.   McNally even obtained an advisory opinion from the Committee on Open Government, which substantially adopted his position, and then arranged for publication in local media.

225.     Agostisi subsequently advised the Committee on Open Government that McNally deliberately omitted salient information in his request for an advisory opinion.  In response, the Committee modified its opinion.  This issue was documented in a local media publication dated May 29, 2019.

226.     This angered McNally and heightened his political animus toward Agostisi.

***Meetings with OSC***

227.     On June 3, 2019, Will Gomes, an Examiner from the New York State Office of the State Comptroller ("OSC"), requested an "end of field work meeting" with Agostisi, Erin D'Antonio (Acting City Comptroller), and Gregory Brouchard (OSC Associate Director of Municipal Affairs) with regard to an OSC investigation of the City.  The investigation consisted of two phases.  Phase 1 started in July 2018 and was regarding separation pay.  Phase 2 started in or about May 2019, and related to all other aspects of the City finances.

228.     The meeting related to Phase 2 despite the fact that Phase 2 had started only shortly before the meeting, while Phase 1 had started over a year earlier.

229.     On June 11, 2019, the end of field work meeting for Phase 2 was held. During the meeting, Gomes mentioned that the Phase 1 (separation pay) draft report was "held up" in the legal division of OSC's Albany office, that there was no Phase 1 end-of-field work meeting because they were instructed to "skip it," that OSC's legal department wrote the findings on Phase 1, and

that he "feels bad" that he had not been able to discuss it with the City.  All of this was unusual as Phase 1 should have been completed first, and should have been handled in the way Phase 2 was handled.

230.    Brouchard then said that Agostisi would be "pleased with the result" of Phase 1, even though he could not "speak to the tone" of the report.  Brouchard then added that the information was "unofficial" and "off-the-record."

231.    Brouchard also said that Phase 2 might be tied to Phase 1, in light of the "media attention" that Phase 1 has received, but that he could not be sure.

### *New Wave Democrats Take Control*

232.    On June 25, 2019, primary elections were held.  Eramo and Diamond both lost their bids for the Democratic Party nomination.  New Wave Democrats won – specifically, McInnis and Treston.

233.    On June 26, 2019, Agostisi received a call from Newsday asking him whether he had any comment on Bendo's campaign Facebook page, "Bendo for Long Beach," which purported to curtail many of Agostisi's powers as Acting City Manager.

234.    The Facebook post stated:

> "Given the results of yesterday's City Council primary election, the following email was sent to the Acting City Manager this morning. It is our intention to ensure our residents and our City employees that our City workforce will continue to provide quality services to the community within a safe and fair work environment.
> Wed 6/26/19 10:21 AM
>
> To: Robert Agostisi; Anthony Eramo; Chumi Diamond; Anissa Moore; Scott Mandel; John Bendo
> ACM Agostisi,
> Effective today, the status quo will be maintained regarding City employee personnel matters. This is including but not limited to:

34

• No new hiring or firing
• No grade changes
• No promotions or demotions
• No awarding of new stipends or changing the amounts of current ones
• No moving of exempt employees into union positions
• No title changes
• No transfers from one department to another
• No approval of separation and/or termination payments beyond contractual obligations or those listed in the City Charter and Code of Ordinances.

None of the listed actions will occur without prior consultation with the entire City Council and approval of a majority of the Council

Regards,
Councilman John Bendo Councilman Scott Mandel Councilwoman Anissa Moore"

235.    The Charter confers hiring, supervision, and termination power on the City Manager.  In addition, the Long Beach Civil Service Commission, which administers the merit system and has oversight authority over many personnel decisions, has and continues to recognize the City Manager as the "appointing authority" under Civil Service Law and LBCSC rules.

236.    While the Facebook post undermined Agostisi's authority, he adhered to Bendo's improper Facebook edict.

237.    On June 28, 2019, Pinto wrote to Agostisi and the Council demanding to know why one of his firefighter members had not received his termination payout.

238.    Agostisi emailed the Council that he planned to submit the payment for the Council's review later that day.

239.    Bendo responded that he did not need to review the payout at issue, so long as it complied with the CBA and Code.   In response, Agostisi noted that the portion of the payout for unused vacation time exceeded the CBA limit by 7.74 hours, which was the result of a legal

settlement in an Article 78 proceeding.  Agostisi also noted that he had received legal advice that the provision of the settlement agreement granting excess vacation hours was legally enforceable.

240.    Bendo then stated: "[i]f you are telling us that the Article 78 is a legally-enforceable commitment…then it sounds like the 7.74 hours [is allowable]," and to "proceed accordingly."

241.    Several minutes later, Mandel emailed: I tend to agree.  If it was pursuant to a settlement agreement (which is a contract), especially one made during litigation, then why was this presented to the Council?"

242.    During the last week of June 2019, the City's Director of Economic Development, Patti Bourne, attempted to secure a letter of support from the Council in connection with a grant issued by the Long Island Regional Development Council ("LI-REDC").  On July 1, 2019, Bendo sent an email demanding to know why the Council was just hearing about the grant for the first time.

243.    Agostisi then forwarded an email chain between himself and Bourne, wherein Agostisi shared his willingness to conduct a presentation, with this proviso: "If you want me to present, I'm going to need a lot more info on what this is all about."

244.    Agostisi also wrote an extensive email explaining the timeline, and sharing that LI-REDC wished to know Agostisi's fate as ACM following the primary elections.

245.    Bourne then wrote an email to Bendo, providing (in relevant part):

> "As I know the members of the LI REDC DRI Committee and having heard the former City Manager make presentations to them in the past, Rob's presentation on June 25 was very well received. As the DRI Committee only invites a very small number of applicants to provide a presentation as finalists, it was a great opportunity for the City. The committee members responded to his points and engaged him in a lively, productive and respectful discussion. They were very interested in his presentation, especially regarding Stop and Shop and the City Hall properties as it is an

exciting concept and responds well to the DRI guidelines and their priorities. Having worked with many developers while at the Nassau County Planning Commission and having completed development deals in other municipalities, I have been impressed with the constructive and respectful rapport that Rob has had with the Stop and Shop Plaza developer. It is a much more complex project than most and requires someone with Rob's abilities and experience to make it work.

At the DRI Committee meeting, it was clear that the committee members expected a quick response from Rob about his future with the City.  I was able to get an extension from the day after the election until this Wednesday, July 3.  That is the final deadline because the REDC is under a tight statewide timeline."

246.     In response, Bendo then sent a misleading email to Bourne which stated:

Patti,

Thank you for the response. There is an additional piece I would like.  I also suspect some other Council members may have the same question.

You stated that the application includes letters of support from Senator Kaminsky, Assemblywoman Miller and the Chamber of Commerce.  Since the Council was not informed of this, that means that a conscious decision was made by Rob, Gordon, yourself or some combination thereof to exclude Council members.  Why?

247.     Agostisi responded:

Thank you for the response.

I have spoken to three (3) other Councilmembers about this grant, and none them have conjectured in the same manner as you.  To the contrary, they all seemed grateful that Patti had the foresight to submit the application, and grateful that we, as a team, were able to work our way through this tough time constraint by cobbling together a compelling presentation amid an all-consuming public health crisis (plus, Pride weekend).   Moreover, no one made a "conscious" decision to do anything; Patti's grants are non-legislative in nature, and do not generally require Council attention until follow-up work is needed, or when there's been an award.   In addition, I promptly alerted you to this situation in my

June 26th email -- the day after the presentation -- and heard nothing back.  I tried again on Saturday, to no avail.  That is time which we could have used to work toward a constructive solution.

John, if this $10M cash infusion doesn't interest you on account of the fact that it is tethered to me, then I cannot prevent you from disregarding your fiduciary obligation to the City (which I've heard you admit to, previously) and instead take your cues from social media and others whose political agendas are not aligned with the City's broader interests.    That is a difficult choice, to be sure.   Please understand however, that we will not permit you or anyone else to build a false and pretextual record at our expense, which this correspondence serves to negate (in any event).

Although 30 minutes is hardly sufficient time to discuss this issue, let alone a transition plan for me, I am still willing to work together to advance the community's interests.   Therefore, I look forward to seeing you from 6:30 p.m. until the Council meeting starts at 7:00 p.m., which is the only time slot you've allotted for this matter.    Time is running out on this grant, however, so we must all act quickly.   Let's be professionals, and put the City first.

I look forward to your response.

248.   Bendo then responded:

The assertions you lay out in your email are offensive. Please never question my motivations again. I am asking these questions as a means to fulfill my obligations as a councilperson, and they have nothing to do with you or your involvement in the project.

Since the request to see the presentation you made to the REDC has not yet been complied with, I was able to get information on the project from other means.  I will sign onto a letter in support of the project and the project alone.  Please draft up and circulate a letter to the council accordingly so we can review and meet the deadline.

249.   Agostisi then finished the exchange with the following email:

As discussed in Patti's email, REDC asked about my future.  I am required to advise them of such.  Therefore, I will draft a letter indicating that you support this project, but also indicate that you have refused to respond to my multiple requests for a meeting, and therefore anticipate having no involvement at all.

38

> Secondly, I gave you my talking points.  So, you had no excuse to violate REDC's confidentiality request.  That's what I actually used in the presentation.  I will continue to question your motivations any time I feel they are retaliatory and vindictive, and don't serve the City's interests.

250.  Sometime after the foregoing exchange, Agostisi learned McNally wrote Bendo's email directing him to "never question my [Bendo's] motivations again," which McNally sent to Bendo's City email address.

251.  McNally, who was Bendo's campaign manager, was employed by the Suffolk County IDA at this time.  His email was sent during work hours.

252.  Subsequently, the City hired McNally as the Executive Assistant to the City Manager, the second highest-ranking employee under the City Manager.

253.  On or about July 16, 2019, the Council voted to authorize a sewer consolidation with Nassau County.  Customarily, Agostisi would have explained the item to the Council prior to vote.  However, Councilmembers instructed Agostisi not to discuss this item because the New Wave Democratic members dominated the audience at Council meetings and Agostisi's support for the project would affect how it was received.  Thus, outside counsel made the presentation, which was unprecedented during Agostisi's tenure.

254.  In July 2019, Agostisi began to seek alternate employment.  Consequently, he asked the Council to meet with him to discuss a transition plan.  This never occurred.

255.  In or about late August, Moore told Agostisi that she had engaged in political caucuses, on City-related matters, with Bendo, Mandel, and Kaminsky.  Moore said that she met with them at least once in Kaminsky's office.

256.   Moore added: "they *hate* you."  She also expressed that their hatred was not policy-based, because Agostisi had performed his role effectively.  She suggested that their hatred was political.

257.   In or about mid-to-late August 2019, Agostisi arranged to become general counsel for the LGBT Network, a non-profit organization.  His intention was to notify the Council in early September and separate in early October.

### The OSC Draft Audit and The Retention of Attorneys to Respond to Same

258.   On August 29, 2019, OSC released its draft audit regarding separation pay.   The City was provided with a deadline of September 30, 2019 to submit a response.

259.   The draft audit, while observing the persistent and continued nature of the City's separation pay practices, and the ambiguities in Code, only analyzed the exempt employees individually (such as Agostisi) who received separation pay in 2017.   Despite being presented with all relevant information regarding separation payments, the OSC failed to sincerely analyze many of them.

260.   While OSC criticized police separation payments, *no police personnel* were singled-out as the exempts were.  Moreover, OSC *failed to mention* any payments made to CSEA members, and failed to list *all of the exempt employees* who received separation payments during the audit period.  These and other factors severely undermined the report's credibility.

261.   Agostisi and other exempts were alarmed by this draft audit, which ignored the historical underpinning of the pay practices, ignored legal interpretations that supported the separation pay practices, contained zero legal support of its legal conclusions and overtly cherry-picked exempt payouts and/or drawdowns while neglecting the remainder.

262.     Based on Gomes and Brouchard's statements to Agostisi and D'Antonio on June 11, 2019, as well as the defects in the audit, the draft audit appeared to be in response to external political pressures on OSC.

263.     Agostisi was particularly alarmed by OSC's characterization of his payment as a draw down, with no mention of Agostisi's well documented efforts to return the payment.

264.     In or about the first week of September 2019, Kaminsky, Bendo, Mandel, and Moore met in Kaminsky's office.

265.     During this meeting, Kaminsky instructed the three Councilmembers to target the exempts, quickly, in relation to the payout controversy; Bendo boasted about one of their close political allies, an attorney named John Ashmead, having a personal relationship with an individual named "Ira" who Moore confirmed was Ira McCracken, OSC's Chief Examiner, who was responsible for (and signed) the Phase 1 draft audit.

266.     Kaminsky's actions were exceptionally alarming to Agostisi, as he had already witnessed Kaminsky's attempt to interfere in the FRB's quasi-investigative process (discussed above).

267.     By this time, Kaminsky had become the *de facto* leader of the Long Island Democratic delegation in the State Senate and was referred to as the "Dean" of this group.  The delegation was considered a crucial swing vote within the State Senate at the time.

268.     On September 3, 2019, Kaminsky attended a Council meeting and openly advocated for civil claw back suits, saying: "it is incumbent upon you as soon as possible to get the money back."

41

269.     During this same meeting, Moore stated that a new firm was being retained to perform work regarding separation payments.   Later, it was discovered that this attorney was John Gross of Ingerman Smith ("Ingerman").[4]

270.     This came as a surprise to Agostisi insofar as Agostisi (vested with the power to sign contracts under Section 20 of the Charter) had executed no such retainer and the OSC draft audit was issued only days prior.

271.     At 7:05 a.m. on September 4, 2019, Bendo emailed Kalnitsky to request a copy of Capozzolo's retainer and invoices.    Agostisi was not copied on this email.   At 11:06 a.m., Kalnitsky forwarded the email to Agostisi for a response, insofar as Kalnitsky had been given strict instructions to work on preparations for the first large meeting with all of the new potential developers for the City Hall/Stop and Shop properties, on September 5, 2019.

272.     Accordingly, Agostisi politely explained to Bendo that his request would be accommodated on September 6, 2019.

273.     Bendo then responded:

> Sending a copy of a contract/agreement that should be readily available is not an arduous task. I expect it to be sent to the Council by close of business today.

274.     In response, Agostisi wrote at 11:38 a.m.:

> Pursuant to the Charter, I supervise all employees, including Greg. His response will proceed in accordance with my email, below.

275.     At 11:45 a.m., in a separate email to just Moore, Agostisi pleaded as follows:

---

[4]   Ingerman was previously retained to represent the City with respect to the union organizing petition filed by the exempt employees.  Mandel originally proposed the retention of Ingerman, where he previously worked with Gross.  During the pendency of the PERB case, several times, Gross told Agostisi that he took his instructions from Mandel.

42

> His [Bendo's] bullying tactics have grown tiresome.   I need Greg
> focused on matters (of superseding importance) for the next day or
> two, not [Bendo's] political agenda.   John will get what he wants,
> however, by the COB this week.  Just letting you know.

276.   At 12:02 p.m., in a separate email chain, Eramo wrote to Gross directing him to

provide a copy of his retainer.

277.   At 12:49 p.m., Bendo responded to Agostisi's email as follows:

> You may also want to refer to the charter to see who it is you work
> for.  You have been instructed by a member of the City Council to
> provide a copy of the signed Anthony Capozzolo contract/retainer
> in a reasonable amount of time.  Which staff member sends the
> document is irrelevant. Compliance with the request by the given
> deadline now rests with you.

278.   At 1:27 p.m., Agostisi responded to Bendo:

> I have double-checked the Charter, and it appears that I am
> appointed by the Council, which is a body.  Please provide the
> section the section of the Charter which states that I "work for" any
> single Councilmember, and/or that you are my supervisor.
>
> You are one individual, not the body, and your instruction is
> unsupported by law.  However, as a professional courtesy, you'll
> receive the information you're requesting by Friday.   In the
> meantime, Greg and I need this time to (among other things) prepare
> for the Stop n Shop/City Hall meeting that's taking place tomorrow
> (as noted in an 8/22/19 email).   This potential transaction carries
> with it the opportunity to expand the City's tax base and utterly
> transform the City's struggling finances.   It has taken literally years
> to arrange this meeting.   I don't know why you believe that your
> request gets to skip the line, but I strongly advise you to put your
> fiduciary duty to the City ahead of your other personal interests.
> The meeting is tomorrow.   Greg will be free to assist you on Friday,
> and will do so.

279.   Then, at 2:23 p.m., Agostisi received an email from Mandel, stating:

> Why is there such an issue in copying and sending a retainer
> agreement? I'd like to see it, too. This should take about 5 mins, I
> would think, and doesn't need to be done by an attorney.

43

Is there any reason why Mindy or anyone else in the office can't scan it and email it to the Council please?

280.  Agostisi then responded to Mandel:

Based on your request, I will ask Greg to pull that single document, and send it to the Council today.  However, with respect to gathering/tabulating invoices, I am asking Greg to provide that information on Friday, as planned, for the reasons set forth below.

Separately, as pulling a single retainer is an easy task, can you please ask John Gross to provide the retainer requested by Anthony earlier today?  I'm unaware of any retainer agreement that supports the representation discussed at the September 3, 2019 Council meeting.

281.  Agostisi wrote (in a separate email thread) at 3:42 p.m. to Gross:

I hope this message finds you well.

Earlier today, certain Councilmembers and I agreed that a retainer agreement is easily located and emailed.  Therefore, I thank you in advance for emailing the one requested by Councilman Eramo, below.  While I don't recall signing a retainer vis-à-vis the legal representation discussed below, it's certainly possible that the former Acting City Manager did sign such a document.   Alternatively, if you have been retained by one or more individual Councilmembers – and do not intend to submit invoices to the City in connection with this matter -- kindly advise.

Thank you for your assistance.

282.  Approximately one-day later, John Gross responded to Eramo's email as follows:

**Please excuse the delay in transmission of this email and the scanned executed retainer attached to President Moore's email.**

**I am informed that the Council did not approve this retainer agreement in public nor did Acting City Manager Agostisi approve the retainer.  Mr. Agostisi wrote the following email which I understand was copied to you:**

Hi John:

I hope this message finds you well.

44

Earlier today, certain Councilmembers and I agreed that a retainer agreement is easily located and emailed. Therefore, I thank you in advance for emailing the one requested by Councilman Eramo, below. While I don't recall signing a retainer vis-à-vis the legal representation discussed below, it's certainly possible that former Acting City Manager did sign such a document. Alternatively, if you have been retained by one or more individual Councilmembers – and do not intend to submit invoices to the City in connection with this matter -- kindly advise.

Thank you for your assistance.

Regards,
Rob

**The appointment of our Firm to provide legal assistance to the Council regarding the current well publicized payment of monies to exempt employees and officers must be made pursuant to a resolution brought before the Council and voted upon in public. (It is our opinion that the concurrence of Mr. Agostisi in the current circumstance is not required.)**

**Rest assured that there will be no fees sought from the City until our appointment is accomplished compliant with applicable law.**

283. Attached to this email was a retainer agreement, geared toward the OSC and other prosecutorial investigations. It was signed by only Moore, without a Council resolution.

284. The email concedes that the retention was not "accomplished compliant with applicable law."

285. Further, the email said that the representation extended only to "the well publicized payment of monies to *exempt* employees and officers." (emphasis added). However, the investigations and the draft audit related to *all* employees.

286. The limited nature of the retention, or at least Gross' stated reason for same, was consistent with the New Wave Democrats' intent to attack their perceived political adversaries – the exempts.

45

287.    Further, Gross' email reflects that he provided the retainer to Moore on August 2, 2019, and received an executed version from Moore on August 12, 2019.

288.    In other words, Gross' retention came within one month of the issuance of the Phase 1 draft audit.  At that point, the audit had been pending for over a year and the release-date was not publicly available.

289.    Thus, it can be inferred that the audit's release-date, and some of its' contents, were leaked to at least one New Wave Democrat, which resulted in the hiring of Ingerman to advise the Council regarding its efforts to target the exempts.

290.    Because the City needed to hire a lawyer to respond to the Phase 1 Audit, in accordance with applicable City law, the City, via Agostisi, retained Capozzolo in a new, standalone retainer agreement to respond to it.

291.    Bendo and Mandel pressured Moore to present Agostisi with a draft Council resolution, prepared (upon information and belief) by Gross, which demanded that Agostisi release his separation pay agreements immediately and painted Agostisi in a negative light.[5]

292.    Moore told Agostisi that she felt compelled to advance the item due to political pressure.

293.    On the morning September 9, 2019, Moore circulated a notice of special meeting (on September 10, 2019).

294.    Agostisi provided his separation pay agreements to Moore in accordance with the terms set forth therein.

---

[5] That notwithstanding, the resolution acknowledged that Tangney "importuned" Agostisi to remain employed by the City in 2017 with a $25,000.00 raise.

295.    Later that evening, and in light of his acceptance of new employment at the LGBT

Network, Agostisi announced his resignation via email to the Council, effective October 1, 2019

at 5:00 p.m.

296.    On September 9, 2019 at 5:37 p.m., the exempts sent an email to the City Council,

copying members of the media, stating, in relevant part:

> Mr. Gross has never worked on this matter, has no access to the tens of
> thousands of documents turned over in this matter, has no relationship with
> the investigators here, has not been present for any interviews, and
> possesses none of the information or insight gained by Mr. Capozzolo over
> the course of the last 1.5 years.  Thus, the selection of Mr. Gross, the same
> union busting attorney who has been retained to oppose the exempt
> employees attempt to unionize…underscores what is the true goal of some
> member(s) of the Council here: to conceal complete disclosure of truthful
> and accurate information in the possession of Mr. Capozzolo to the
> Comptroller…[with an attorney] who intends to target only a small group
> of individuals for discriminatory and unlawful reasons.
>
> *              *              *
>
> Your selection of Mr. Gross to submit a sham response to the draft audit is
> a transparent effort to conceal the benefits conferred to other City
> employees, union and non-union, to curry political favor in an election year.
> Clawing back funds from established union members and some favored
> exempts is obviously harmful to an election campaign, and the targeting of
> a small sample of exempt employees, whom some of you regularly and
> publicly castigate for political purposes, provides a convenient scapegoat
>
> *              *              *
>
> [E]ach of you owes a fiduciary duty to the City.  You violate that duty when
> you deceive the public by deliberately and arbitrarily shrinking the pool of
> employees from whom you may claw back funds.
>
> *              *              *
>
> We trust you will honor your fiduciary duty by placing the City's long-term
> interests ahead of some Council Members(s)' political vendetta, which is
> clearly apparent here.

297.    On September 10, 2019, at 11:55 a.m., Gomes left Agostisi a telephone message seeking to schedule a close-out meeting for Phase 1 of the audit.

298.    On September 11, 2019, during a return call, Agostisi asked Gomes (in sum and substance) whether it would be more beneficial to schedule the conference *after* the City submitted its response to the draft audit (due by September 30, 2019), so there would be an opportunity for a more meaningful dialogue.

299.    Gomes responded that he would need to discuss this with his supervisor.  Agostisi then heard whispering in the background from an unidentified source, who Agostisi believed to be McCracken, as he was Gomes' supervisor.

300.    Gomes stated that OSC would not wait for the City's response before conducting the close-out meeting.  When Agostisi asked whether OSC would entertain an adjournment request for the September 30 deadline, he was told that the deadline would not be extended.

301.    Agostisi then forwarded Gomes' correspondence to the Council, so that they could schedule the meeting.

302.    After this exchange, Agostisi instructed Kalnitsky to have the City's response prepared by, and submitted at, the close-out meeting.   That meeting later took place on September 23, 2019, without Agostisi in attendance.   Both Kalnitsky and Capozzolo (who possessed actual and apparent authority) represented the City, and presented the City's response both in writing ("Capozzolo Report") and in person.  Capozzolo's correspondence to OSC dated September 23, 2019 is incorporated by reference herein.

303.    The Capozzolo Report did not defend any single employee, but, rather, set forth a meticulous empirical evaluation of information that OSC failed to analyze or consider.  This included, but was not limited to, a detailed analysis that listed payouts that shed light on the City's

48

overall separation pay structure, as opposed to the distorted view presented by OSC in the draft audit that isolated only a small handful of payouts to active exempt employees (dispensing with all others).  The Capozzolo Report also set forth the legal undergirding for payout practices that spanned over 20 years.  It also itemized the legal and financial obstacles that the City would encounter in any "claw back" litigation, as conditionally recommended by OSC.

304.   On September 17, 2019, outside counsel for the City in the iStar litigation advised Agostisi of a court conference that was attended by all parties that day.

305.   During that conference, iStar readily admitted that they and/or the prospective purchaser of the Superblock were negotiating a tax abatement package with Kaminsky.  Most of the Council was excluded, as was Agostisi, who was the only individual (among this group) that possessed detailed institutional knowledge of the Superblock.  Additionally, Kaminsky, who was not on the IDA Board, was not authorized to represent the City as a taxing jurisdiction.  Agostisi later learned that Bendo attended one or more of these meetings with Kaminsky.

306.   This eliminated any doubt, whatsoever, that Kaminsky had become the *de facto* political party leader.

### Agostisi's Resigns and John Mirando becomes City Manager

307.   On September 23, 2019, Bendo announced a special Council meeting to take place at 7:30 p.m. to appoint a new Acting City Manager on September 24, 2019.

308.   Agostisi submitted his formal resignation letter to the Long Beach Civil Service Commission at 4:59 p.m. on September 24, 2019.

309.   Agostisi departed with 372.61 hours of accrued vacation time, 17.50 hours in accrued personal time, and 379.51 hours in accrued sick time.

310.    Agostisi has received no separation pay in connection with these unused hours, despite the fact that such payments became due on October 4, 2019.

311.    On September 24, 2019, DPW Commissioner John Mirando was appointed Acting City Manager.

### The Recission of the Capozzolo OSC Response, and Substitution of the Ingerman Response

312.    On September 23, 2019, Executive Assistant to the City Manager Gordon Tepper, overheard a member of OSC calling his office to advise that the City's response had just been submitted to OSC, and asking for instructions.  The substance and tone of the conversation led Tepper to conclude that OSC was surprised by the Capozzolo Report..

313.    Bendo and Mandel wrote to OSC to ask for permission to submit another response even though they cannot legally bind the City because they consist of a minority of the Council acting outside of a public meeting.

314.    On September 25, 2019, one day after Agostisi's resignation, McCracken responded to Bendo and Mandel's request, stating that the OSC will accept only one City response. McCracken also cited an OSC rule stating that the response must be signed by the "chairman of the governing board or the chief executive officer or someone acting on his or her behalf."

315.    McCracken ignored the fact that two attorneys, with full agency power and expressly authorized by the City Manager as per the Charter, already submitted a response on September 23, 2019 that conformed to this rule.

316.    On September 25, 2019, Acting City Manager Mirando sent a signed letter to McCracken, which stated that the Capozzolo Report "represents the full and official response of the City of Long Beach."

317.     Bendo then sent an email to Mirando (copying the Council) that said, among other things: "… this has now created a potential governing crisis, pitting staff against elected officials."

318.     The Capozzolo Report highlighted *all* separation payments to *all* classes of employees *over an extended period of time*.  Thus, Bendo's September 25 email reflects the New Wave Democrats' plan to use OSC's audit as a tool to attack *only* their perceived political adversaries, the exempts.  This was also consistent with Bendo's statement to CSEA President John Mooney, on May 17, 2018, when he explained that his actions were not intended to "go after" CSEA members, but, rather, exempts.

319.     Subsequently, Bendo and Mandel sent another unauthorized letter to the OSC on September 27, 2019 asserting that Mirando's September 25 letter was sent without consulting the full Council.  However,  Mirando had obtained prior permission from Eramo, Diamond and Moore to send his letter.

320.     Regardless, the City Manager was not required, under the Charter and/or OSC's rules, to obtain prior permission from the Council for such a submission.  Moreover, the Council (upon information and belief) had never previously submitted a response to an OSC draft audit, a duty that routinely fell upon the City Comptroller and/or City Manager.

321.     On October 1, 2019, Bendo, Mandel and Moore sent a letter to OSC stating that the Council did not approve the Capozzolo Report, noting that it needed new counsel to respond.  This contradicted the prior authorization to Mirando for submission of the Capozzolo Report.

322.     The foregoing letter was not adopted in a public meeting, in violation of the Open Meetings Law.

323.    On October 4, 2019, OSC asked whether the Council intended to rescind the Capozzolo Report, and prospectively gave the City an adjournment to November 11 to submit a new response.

324.    The October 4 letter was sent in disregard of the Charter, applicable agency principles, and a New York State Court of Appeals holding regarding the powers of the Long Beach Corporation Counsel.   It also violated OSC's rules, and contradicted OSC's previous adherence to the September 30 deadline.

325.    On October 9, 2019, McCracken advised a single Councilmember that OSC would not require that the revocation of the Capozzolo Report take place in public meeting, in contravention of the Charter and the Open Meetings Law.

326.    Bendo then called for a special Council meeting to take place, *at 7:00 a.m.*, on October 11, 2019, to rescind the Capozzolo Report.  The proposed time of the meeting was unusual and purposely designed to discourage citizen participation.

327.     As part of his job duties to draft resolutions, Kalnitsky subsequently wrote and, with Mirando, published a resolution (No. 1, October 11, 2019) setting forth a chronology of the OSC's interactions with the City and the content of the Capozzolo report.

328.    With respect to the Phase 2 draft, the resolution stated: "the City Council, as of the date of this Resolution, has not responded and has no intention of submitting a response to the draft [audit]…highlighting a multi-million-dollar structural deficit in the City of Long Beach's budget…."

329.    This statement was consistent with the fact that the New Wave Democrats had no interest in Phase 2, because their attention was fixed solely on using the Phase 1 audit as a tool to attack their perceived political adversaries.

330.    At the October 11, 2019 Council meeting, Bendo called the foregoing resolution "horseshit."  The Council then voted to rescind both the resolution and the Capozzolo Report.

331.    During the meeting, Kalnitsky asked the Council what was wrong with the resolution.  No legitimate reasons were provided for the recission.

332.    In addition, Kalnitsky specifically asked the Council which portion of the Capozzolo Report was incorrect.  There was no response.

333.    The Council rescinded the Capozzolo Report without identifying a single inaccuracy.

334.    Just before voting in favor of the recission, Moore emphatically stated: "we are now erasing the record that the City has provided.  We are now hiding the wrongs."

335.    The Council did not permit public comment on this resolution, contrary to City Code § 2-31(G) and its regular procedures.

336.    Subsequently, the Council retained Ingerman to submit a response in place of the Capozzolo Report.

337.    On November 8, 2019, just one business day before the November 11 deadline, Gross requested another adjournment from the OSC via McCracken.

338.    The November 11 deadline came and went without any adjournments granted, and without a submission from the City.

339.    On November 14, 2019, Gross had a call with Eric Eichenlaub, OSC Deputy Counsel, and Mark Stevens, OSC Senior Attorney, wherein the submission deadline was extended to November 22, 2019.

340.    On November 22, 2019, the Council met to adopt Ingerman's response to OSC.

341.   The Ingerman response was rife with inaccuracies and targeted only Schnirman and Agostisi for claw back litigation -- the perceived leaders of the opposition to the New Wave Democrats.

342.   The response did not isolate or separately analyze individual payments to CSEA, PBA or LBPFA members.

343.   The response consistently referred to Agostisi as "Acting City Manager 2." However, Agostisi served solely as Corporation Counsel during the audit period.  This made it appear as though Agostisi was on both sides of his separation pay transaction, i.e., the person who authorized and received it.

344.   In the introductory section, Ingerman made false accusations against Agostisi:

> … when the Council attempted to retain outside independent counsel to conduct an independent investigation of the matters referred to in the audit reports through execution of a retainer agreement by the Council President, such attempt was thwarted by the previous Acting City Manager.
>
> Agostisi claimed that only the City Manager could execute such an agreement pursuant to the City Charter, employing the services of outside counsel. *See* City of Long Beach, N.Y., Charter Art. 3, § 20 (1922). Pursuant to Agostisi's interpretation of the City Charter, the Council was essentially stripped of the authority to hire independent counsel, or for that matter any independent organization to diligently investigate claims without the approval of the Acting City Manager including for example a forensic audit accounting firm.

345.   Agostisi never said that there was any impediment to the Council from appointing independent counsel.  However, the Council did not do so in this case, until it instructed ACM Mirando, in a resolution, to execute Ingerman's retainer.

346.   ACM Mirando detailed the response's deficiencies in an email dated November 22, 2020.

54

347.    As a result of Mirando's and Kalnitsky's admonitions, the Council instructed Gross to prepare a new response, which was adopted by Council resolution several hours later on November 22, 2020.

**The City's Waiver of Attorney-Client Privilege**

348.    In late November 2019, the DA wrote to the Council, requesting that it waive the attorney-client privilege as part of its investigation.

349.    On Saturday, January 11, 2020, the Council voted on a resolution to waive the attorney-client privilege with respect to separation pay.

350.    Kaminsky spoke at this meeting, encouraging the Council to execute the waiver.

351.    The resolution purports to immunize Ingerman from this waiver by carving-out Ingerman's communications and work product from disclosure, while allowing such disclosure for Capozzolo.

352.    New York law holds that such "limited" waivers are invalid; the privilege is either waived, or it is not waived.

353.    An Ingerman attorney stated, during the Council meeting, that the Council was apprised of the risks beforehand.

354.    The Council then waived the attorney-client privilege, likely because of the Council's belief that such a waiver may damage its political adversaries.

355.    In or about January 2020, the Council instructed Mirando, as Acting City Manager, to avoid allowing his positive views of Agostisi to affect his judgment.  Mirando read this directive aloud at a staff meeting.

*Lawsuits against Agostisi and Schnirman*

356.    In July 2020, the Council adopted a resolution authorizing a state court action against Agostisi in connection with separation pay.

357.    A separate resolution authorized a litigation against Schnirman, who was sued in a separate action.

358.    Both resolutions were adopted unanimously by those Councilmembers in attendance, which included Bendo, Delury, McInnis, Treston, and, upon information and belief, Mandel.

359.    These Councilmembers knew that these lawsuits lacked merit based upon the findings detailed in the Capozzolo and OSC Reports.  They also knew that the benefit to the City of such litigation would be greatly outweighed by the cost of same.  Thus, the vote was motived by political retaliation.

360.    The Councilmembers knew that the OSC Report mentioned overpayments to Police personnel, and thus to the extent claw back litigation ensued as a result of the OSC Report, such litigation should have been brought against all allegedly overpaid employees, instead of retaliating against specific employees who had engaged in Constitutionally protected conduct.

361.    The resolutions to initiate legal actions departed from the Council's ordinary lawmaking procedures, inasmuch as the resolution does not specifically name of the target of the lawsuit.  By hiding the identities of the defendants, the Council precluded public debate on the merits, risks, and/or costs of the cases.

362.    In addition to other baseless allegations about his separation pay agreements, the lawsuit against Agostisi seeks to recoup payments made to other City employees, despite the City's

knowledge that Agostisi played no role in authorizing those payments and the longstanding practices that gave rise to them.

363.     On July 17, 2020, an action was filed in Nassau County Supreme Court entitled *City v. Agostisi,* Index No. 607238/2020.

364.     In September 2020, at great financial and emotional expense, Agostisi submitted a motion for a change of venue.

365.     Within the Memorandum of Law supporting the Change of Venue motion, citing the Affidavit of Agostisi, the following allegations were stated:

> This lawsuit and the City's incorrect statutory interpretation is driven by political retaliation. (Aff., ¶¶ 4-7). As concluded by the Office of the New York State Comptroller ("OSC"), the practices at issue extend decades prior to Agostisi's tenure. (Aff., ¶ 5). Hundreds of employees benefitted from such practices. To date, the City has filed actions against only Agostisi and former City Manager Jack Schnirman. (Aff., ¶ 6). While the City offered other employees the opportunity to resolve the dispute by sending demand letters, Agostisi was not given such an offer and instead was served with a summons and complaint. (Aff., ¶ 6).

**The DA Report**

366.     In October 2020, DA released a report that detailed the results of its investigation of separation pay.

367.     This report outlined the reasons why the DA declined to press charges against anyone.

368.     With respect to Agostisi, the DA analyzed the legality of his separation pay agreements, and did not suggest that Agostisi had authorized (or was responsible for authorizing payments) to any other employees. Nor did it accuse Agostisi of establishing any payout practices. To the contrary, it observed that other employees received payouts for 100% of accrued sick leave before Agostisi.

369.     The Report contained the following additional findings, among others:

a.    with respect to the Asarch Memorandum: "Regardless of whether that reasoning was sound, we concluded that there could be no criminal liability for recent and current Long Beach officials who were operating under a long-standing practice that they had no role in creating and no incentive to change."

b.    "it is possible that a person could, in good faith, have believed that distinctions in the vacation and sick leave sections allow for a payout of more than 30 percent of sick leave."

c.    "we face the insurmountable obstacle of proving that those in authority acted in bad faith, i.e., knew that their interpretation was wrong and that their sole or primary motive was to enrich themselves. We found no such evidence."

d.    With respect to drawdowns: "the City Code has no provision authorizing draw-down payments but does not explicitly forbid them either. Given that this was a long-standing practice, upon which others relied, and that there was no explicit statutory prohibition, we concluded that authorizing a draw-down payout could not be the basis for a criminal charge."

### The Subsequent Filing of Additional Separation Pay Lawsuits

370.     In April and May 2021, after Agostisi highlighted that the retaliatory motivation in filing these suits was evidenced by the targeting of him and Schnirman, the City filed claw back lawsuits against several other exempt employees, including Tangney, Hightower, Tepper, and Michael Robinson.

371.     No cases have been filed against *any* union employees for any separation payments while they were union members.

372.     The City's complaints against other exempts merely seek restitution of amounts the employees were allegedly overpaid alleging only unjust enrichment claims.

373.     Unlike claims against the other exempts, the claims against Agostisi include claims for fraud, breach of fiduciary duty, and the faithless servant doctrine.

*Facts Underpinning the Retaliatory Defamation*

374.    In May 2021, a restauranteur named Brian Braddish, called Agostisi's supervisor at the LGBT Network, Kilmnick, to enlist his support after the City allegedly ordered Braddish to remove a Pride flag near his premises.

375.    Subsequently, Kilmnick held a press conference and protest on the Long Beach boardwalk.

376.    Bendo and McNally attended and Bendo spoke to the press, wherein he blamed Agostisi for the protest, without any proof whatsoever.

377.    On May 15, 2021, McNally (upon information and belief) authored or co-authored an internet post, at Bendo's behest, which was published on the City's official website and Facebook page and provided, in relevant part:

> And legal counsel to the LGBT Network is Robert Agostisi, the former Corporation Counsel employee of the City of Long Beach.  Agostisi is being sued by the City for payback of hundreds of thousands dollars after the NY State Comptroller and Nassau County District Attorney concluded that his efforts as an employee of the City, along with others, were a violation of the public trust and represented an abandonment of fiduciary duty.

378.    Neither the Comptroller nor the DA rendered such a conclusion about Agostisi.

379.    Additionally, Agostisi did not plan or orchestrate the protest.

380.    These retaliatory and defamatory statement about Agostisi are demonstrably false.

## CLAIM FOR RELIEF

### Count I
### (42 U.S.C. § 1983 – Unlawful Retaliation)

381.    The City has, while acting under color of state law, deprived Plaintiff of his rights under the United States Constitution including his Freedom of Association and Freedom of Speech, as secured by the First Amendment to the United States Constitution.

382.    The City is liable under 42 U.S.C. § 1983 because, among other reasons, the Constitutional violations were committed by policymakers and/or because policymakers were deliberately indifferent to the Constitutional violations.

383.    The Individual Defendants[6] have, while acting under color of state law, deprived Plaintiff of his Constitutional rights including his Freedom of Association and Freedom of Speech.

384.    The Individual Defendants intentionally committed, condoned, or were deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights.

385.    Plaintiff is a member of constitutionally protected groups, engaged in constitutionally protected conduct, and was subjected to retaliatory action in relation thereto. Plaintiff's constitutionally protected conduct included, *inter alia*, his: (a) actual or perceived association with the exempts and the Schnirman administration, and/or his non-association with the New Wave Democrats; (b) actual or perceived lack of political association with and/or loyalty to Kaminsky and/or Kaminsky's political beliefs, goals, or agenda; (c) union association in the form of efforts to unionize exempt employees and/or his actual or perceived leadership role with

---

[6] Claims against Defendant McNally include only retaliation and defamation for his retaliatory publication which occurred on May 15, 2020.

60

respect to a group which sought same; and/or (d) actual or perceived advocacy in support of unionizing and collective bargaining efforts.

386. Plaintiff was subjected to retaliatory adverse actions after Plaintiff's employment with the City ended, including the City's failure to pay Plaintiff for unused accrued time and the institution of a state court lawsuit against Plaintiff.

387. Additionally, Defendants City, Bendo, and McNally made retaliatory and defamatory statements about Plaintiff.

**Count II**
**(Due Process)**

388. Payment for accrued, unused time earned by public employees is a vested and protected property right under the federal and state constitutions.   Additionally, Plaintiff maintained a property right in his accrued, unused time pursuant to contract.

389. The City has deprived Plaintiff of payment for certain accruals which were due and payable, pursuant to the City Code and/or contract, and have not been paid.   Such deprivation occurred without due process of law.

390. The Individual Defendants effectuated such deprivations and/or have been deliberately indifferent to same.

**Count III**
**(Breach of Contract)**

391.  Plaintiff and the City had binding and enforceable contracts that provided for, *inter alia*, Plaintiff to be paid for his unused vacation, personal, and sick time.

392. The City has failed and refused to pay Plaintiff for 372.61 hours of unused vacation time, 17.50 hours of personal time, and 379.51 sick time, despite Plaintiff's full performance under the contract.

61

393.     Plaintiff performed all his obligations under the contracts, which entitled him to payment of the above accruals, which the City failed to pay.

**Count IV**
**(Defamation & Unlawful Retaliation)**

394.     Defendants City, Bendo, and McNally published the following statement on the City's official website and Facebook page:

> And legal counsel to the LGBT Network is Robert Agostisi, the former Corporation Counsel employee of the City of Long Beach.  Agostisi is being sued by the City for payback of hundreds of thousands dollars after the NY State Comptroller and Nassau County District Attorney concluded that his efforts as an employee of the City, along with others, were a violation of the public trust and represented an abandonment of fiduciary duty.

395.     Defendants City, Bendo, and McNally knew or should have known that their statement that "the NY State Comptroller and Nassau County District Attorney concluded that [Plaintiff's] efforts as an employee of the City, along with others, were a violation of the public trust and represented an abandonment of fiduciary duty" was false.

396.     This statement charged Plaintiff with a serious crime and/or injured Plaintiff's reputation, business, trade and/or profession.

WHEREFORE, Plaintiff demands judgment against Defendants for all economic, non-economic, compensatory, emotional, physical, and punitive damages (where applicable as against individuals only), lost wages, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled.  Plaintiff demands a trial by jury.

Dated: Carle Place, New York
           December 30, 2021

LEEDS BROWN LAW, P.C.
*Attorneys for Plaintiff*
One Old Country Road, Suite 347
Carle Place, N.Y. 11514
(516) 873-9550

_____/s/_____
RICK OSTROVE
BRANDON OKANO